Good morning, Your Honor. May it please the Court, Gail Ivins, appearing on behalf of Defendant Appellant Maher Hamdan Abbouchi. First, I want to apologize to the Court for my computation error when I moved to withdraw two of five arguments. It should have been two of six, so I apologize if I somehow missed that sixth argument in my brief because it wasn't addressed so much in the reply brief. So what we have left after this panel has agreed to let me withdraw those two is the Border Search Issue, Issue No. 1, the whether Social Security cards are identification documents under 1028, and the two supervised release issues, the first one being whether there was a Rule 32 violation or improper imposition of the domestic violence treatment condition, and the fourth one being the one that I omitted to remember, which is the reporting requirement upon reentry. And I wanted to start with this one. Before you get into your whole argument, at some point in your argument, when you get to that fourth item, please address whether Rodriguez-Rodriguez, an opinion of Judge Beezer, in which I joined, doesn't that adversely decide that issue against you? I realize the mandate hasn't issued yet in Rodriguez-Rodriguez, but at least if you accept it, is it against you? Oh, it's against me. It's dispositive, I think, in our case, on our facts, and it's preserved because I know the petition for a hearing on Bonk has been circulated and there's been no ruling yet. So to the extent that this Court could still change its mind on Rodriguez, I, you know, we're preserving that issue. Okay, thanks. Thank you, Your Honor. So this morning I wanted to start with the issue of Border Search and specifically, I'll leave the question that we did preserve in the lower court. And I did argue in the brief about the constitutional distinction between an ingoing or outgoing search. I'll leave that for a later court, since this Court has already ruled on that rather dispositively. But I do want to discuss this question of the difference between a functional equivalent Border Search or an extended Border Search. And the important consequence of that being whether the government was required to have reasonable suspicion or not when they searched the UPS package in Louisville, Kentucky. This Court has noted the ---- Are you going to talk about the consent? Your Honor, I can talk about the consent first, because I think if we get to that issue, if I'm successful on the other issues, I do think that would require a remand to the district court. There are several reasons. One is Judge Minnella, you know, advised the parties at the beginning that she thought the case was not going to be resolved on consent. She observed, I think correctly, that the language on the FedEx waybill that was discussed in detail in the Selgin case and the language on the UPS waybill that was at issue in our case were distinct. And she thought it wouldn't be resolved on that issue. And so there really is the government really, frankly, didn't have an opportunity to meet its burden to prove consent, which is a factual question under the totality of the circumstances under Shecklenclough versus, I can't say the name, Bustamante. And so ---- Schnecklau, Schnecklau. Thank you, Your Honor. So I think that were we to get to that point, if I were successful on the other issues, that would require a remand, I think, to the district court for the government to have an opportunity to present that evidence, because it was not presented here. There are ---- even in the trial testimony, even if we were going to go to the trial testimony, the manager of the UPS store, Rita Patel, didn't really testify as to anything in terms of, you know, whether he was notified, did he know, what do we do about adhesion contract law in California. And I can see a plethora of issues that would appropriately be litigated if that question were going to be decided. But I do think that the questions currently before the Court where the government did submit evidence that my position is was insufficient is this question about the spatial and temporal proximity to the actual departure. The Supreme Court, we have the Almeida case where the Supreme Court held that 20 miles away, a roving patrol, that was basically neither extended nor functional. I don't know they were really, you know, using all of the language we now use, but that was not the functional equivalent of the border. And if Judge Gould is speaking, I can't hear him. Okay. I'm sorry. There was a distraction here that I had to terminate. And so, although this Court has noted that it's difficult to make those distinctions between what is extended and what is functional, that is the important question in this case. Agent Crase testified when he testified before Judge Anderson that he had, quote, no clue, close quote, where the package was going to go after it left Louisville. And that's at ER 71 and 78. He said he couldn't speak for UPS because he did not know how they load their planes. And that's at ER 76. He said he didn't know if the package would or would not travel to another UPS hub, and if it did, he didn't know how long it would stay there or whether the cans that the documents, the packages were packed into, would or would not be redistributed to other planes before departing the United States. In fact, he clarified he'd never been to the Philadelphia airport, worked at the Philadelphia airport, didn't know anything directly from personal knowledge as to what happens at the Philadelphia airport if that's even where this package would have gone. The record actually does not establish whether it would have definitely been Philadelphia or Miami or some other place where the plane would have gone before departing the United States, nor how long it may have stayed there. Does it make any practical difference? Well, I think it does, Your Honor. I think it does because of the we're, we've developed this rule based on historical and constitutional antecedents that allows the government to search without cause, without probable cause at all, no reasonable suspicion and no warrant. And if we're going to have a rule that is so invasive of a person's privacy and a person's expectation of privacy, then we have to have the consequent reason for the rule. And the reason for the rule is that it's the border. And we've had a lot of development of that law, both in the Supreme Court and in this Court, about so where is the border and when are we going to call it a border? And a lot of the cases that Judge Stotler relied on, for example, in her Selgin decision, are cases where we talked about delayed border searches. And all of those Second Circuit and other circuit cases were very concerned with the idea of, okay, so it's come into the country and that's the point of entry. And now it went further away for Customs to be able to search it later and we want to let them do that, but it was under their control the entire time. There's always a very careful and detailed analysis of how are we going to say that the point of entry, when actually the plane comes from, you know, Mexico City and lands in St. Louis, the example given in Almeida, how are we going to say how far away from that it can be before we require not even reasonable suspicion? And I'm not arguing, Your Honor, that this would not have been an extended border search. But it wasn't. I mean, that's what it was. The problem here is it's not a border search. You're dealing with packages here that go on airplanes. And those are searched routinely these days. Your hand-carried luggage is searched. Well, is it searched at the UPS store in Diamond Bar? Your person is searched. It's easy that the practical difference, the package isn't going to get up and walk out of the system itself. The package, once it's put in the system, is going out of the country unless it's intercepted for some reason. And I really don't understand the practical problem of Customs deciding to organize, well, let's do all of this at the hub. I mean, they've got a couple of choices. Either they can just stand around the perimeter of the country and try to get the last stop wherever it may be, Philadelphia, Miami, Anchorage, Los Angeles. Or they can do it all at the same place since everything gets funneled through the same place. And once they do it there, it's all locked up and it's going out. I mean, theoretically, yeah, Louisville is 1,000 miles from the ocean, but practically speaking, if that's where Customs decides for practical reasons to search everything, what's the extra imposition? What's the harm to your client? Well, Your Honor, that could be this case if there had been further factual development. And so I guess the important point I want to make is even if this Court accepts Judge Stotler's reasoning in Selgin in toto, so even if we go 100% and this Court just adopts her decision, our case is distinguishable. One distinction is they aren't locked. There's no evidence in the record that the UPS cans at Louisville, Kentucky as compared to the FedEx cans or packages or whatever they called them at the Oakland International Airport were locked. That actually is a word that Judge Stotler uses in her decision. It's a question that was asked of Agent Krase, and he said, well, no, they're not locked. I've never seen a lock. They're sealed. I accept that, but what difference does that make? Customs isn't checking them again. We don't know that, Your Honor, based on this record. He said, probably, not usually, I've never been there. So I guess I'm not saying that I would disagree with the Court if the facts had come out the way the Court is describing them, but we actually have no information in this record other than Agent Krase's speculation as to what UPS's practices are. There's nothing about this decision. If the Court were to affirm here, then UPS can really do whatever they want with no, there's no constraint. I was concerned about UPS, and now I'm about Customs. It's Customs that has the right to search, arguably, based on this border search. UPS has no rights as a border search. UPS arguably has rights based on consent, but the border issue is one that focuses on the government agents, and there's no reason to think the government's doing it more than once or has tried to set up both at the hub and the perimeter. The indication is that they've set up doing everything at the hub, which, frankly, is a pretty logical way to do it. So again, I'm not sure, I understand the factual distinctions you're drawing, but I'm not sure that I do understand what difference they should make. Well, I think until the Supreme Court says it doesn't make a difference, the law is clear that it does, and we're looking at the temporal and spatial proximity to the departure. And I think in this case, the problem is Louisville, Kentucky is rather landlocked. It's, you know, 600 or 700 miles or 1,000 miles, depending on which way we're heading out of the country. UPS and Customs have entered into this, you know, convenience, this business relationship to buy a border, essentially, for 66 cents a package. And the question is, does that comport with Fourth Amendment jurisprudence? And so there may not be any practical reason, but the Constitution is not always practical. That spatial and temporal, that works probably okay for when you're on the ground, when you're on land, when you're moving vehicles or trucks or whatever, but not by air. Well, and I think the question is, if we're going to have business relationships to I assume save UPS a lot of money, I assume that's why they want to do this in Louisville, Kentucky, rather than an actual port city, you know, do we get to then search everything with border search permissiveness, or does there need to be reasonable suspicion? Is it an extended border search? And I would submit that under the case law we have now, to hold that this is a functional equivalent of the border search is an extension of existing case law. And I think there are good reasons, certainly the good feeling we have, knowing we have a Fourth Amendment, that we should hold that this was an extended border search. And that would be even if this court were on the case submitted just previously to fully adopt everything that Judge Stotler has said in her published decision. In her case, the search was, she found specifically after detailed factual presentation in the court, that it was a few hours before the scheduled departure. We have no information in the record other than an inference possibly from, you know, the date the package was supposed to arrive, October 1st or 3rd, depending on where you look in the record, and the date it was searched. We don't know how many hours before it would have actually left U.S. airspace. It was, you know, less than 20 miles from Oakland to San Francisco, to then leaving the continental United States. And so we have a- She was- I live in Anchorage. It's still the U.S. That's true, but she did analyze those both separately and basically said, if Anchorage matters, I find reasonable suspicion. So even Judge Stotler and Seligen realized that that was a little bit more of a push on existing case law. And I think that that closeness, that the effort that she went to, to draw that closeness, is an indication of why this case on these facts needs to be reversed. Well, you know, Customs looks at the package and sees that it's going overseas, right?  Yes, Your Honor. So they inspect it, they looked at it. As they did in Cardona. They knew it was going overseas, but this Court held that 3,000 miles from the border and 24 hours before it was going to leave was an extended border search. I mean, so I don't think that- I mean, that is certainly a reason to make it an extended border search. What if Customs took it and just put it through one of these X-ray machines? Would that be all right? Well, what if they do it in Diamond Bar at the UPS store? I mean, that argument works at the point of receipt. Now, what would be wrong with that if it's supposed to go on an airplane? And it's handed to UPS? UPS is concerned about the safety of its planes? I mean, I don't know that they don't do that. Well, what UPS does, Your Honor, of course, obviously doesn't implicate the Fourth Amendment. When it's picked up, that they don't look through that. I mean, the difference here, Your Honor, is if UPS is doing something to packages when they're receiving them, that is not a Fourth Amendment issue. That's a totally separate contractual problem. Well, then what about the expectation of privacy? Well, then you can sue them. You think people put packages on planes these days and think that no one's going to look inside them? Well, and that is a finding that the district court was able to make insurgent because they had evidence with regard to what the expectation was and with regard to what the language was. And, you know, the defendant actually testified in that case. So we just don't have those facts in this case, Your Honor. So I don't think we can make that assumption.  Yes, Your Honor. If, assuming that we agreed with your argument that the factual record here was not sufficiently developed to conclude that Louisville was the functional equivalent of the border, if we were to conclude that, would we be required to go on at that state, on this record, to assess whether it's an extended border search, or could we simply remand to the district court for more factual development and then decide the issue whether it's a functional equivalent of the border or an extended border search against a more complete record? I think that I might leave discussion of that further to government counsel, Your Honor. They do have a footnote in their brief where they try to justify if we were to get to reasonable suspicion on this record. I don't think that issue was really litigated. And I don't think the only thing they can point to, frankly, is that this is a personal package from one person with an arguably Middle Eastern name to another person with an arguably Middle Eastern name from California to Lebanon. And I just, on that record, I don't think they've shown reasonable suspicion. Let's assume there isn't reasonable suspicion. But still, what I'm asking is whether, if we think the record doesn't support at this stage an affirmance that it was the functional equivalent of the border, could we remand for the facts to be developed on that issue before we decided if it was functional equivalent of border or extended border search? Because if there wasn't reasonable suspicion, then that issue would be dispositive. And normally, you know, the panel may be ready to decide that on the record we've got. But if it thought the record inadequate, that's what I want to know is whether procedurally we could handle it that way. If I had a really good argument that said I could somehow preclude the district court from developing the record, I would certainly make it. But I don't think I have a case to cite to the Court. So I think clearly this Court has the authority and perhaps even the obligation to allow that evidence to be developed in the district court. Kennedy. Do you want to talk about the sentencing issue? How about if I save my last two minutes for rebuttal and see what the government says and respond? All right. Thank you, Your Honor. Thank you very much. Good morning, Your Honors. May it please the Court. Doug Fuchs for the United States. I want to pick up with a question by Judge Clifton, and that is does it make any practical difference here whether the aircraft that was going to contain the defendant's package would have stopped someplace else? And I think the answer on this record is clearly no, it would not have made a practical difference. And that's because there was ample factual development in this record to establish that whether this package went directly out of the United States or whether it stopped in one of three other locations, Miami, Philadelphia, or Anchorage, it would not have been searched again. Officer Crace testified no fewer than five times on that exact point, saying unequivocally that the package would not have been searched again because those other stops are either gas and go stops or they're stops where a container is formed that the plane has arrived, or do they have an opportunity to search again? So the record here is complete. And two separate district court judges, Judge Minella and Judge Anderson, both found that the Louisville hub was the functional equivalent of the border. And those two decisions were not clearly erroneous. Did Judge Anderson actually revisit that issue or did he simply build on the denial of the motion to suppress that had been entered by Judge Minella? I think there was some confusion initially at the hearing before Judge Anderson. However, as the hearing progressed, I think it's clear on the record that Judge Anderson did, in fact, revisit that issue. He allowed for cross-examination. He then asked questions of Officer Crace himself. He allowed subsequent cross-examination after he had asked questions. And then finally, he made extensive factual findings on that very point, that it was the functional equivalent of the border, and that any subsequent stop, and there's no evidence that there would be a subsequent stop, but any subsequent stop would not have affected that analysis. I don't know if the... Counsel, you said in your argument that the judges made a finding, it was the functional equivalent of the border, which is not clearly erroneous. So my question is on the standard of review, I certainly understand that subordinate findings of particular facts would be reviewed for clear error. But is the issue whether something on the facts as determined is the functional equivalent of the border a legal issue that we review de novo, or is there any authority on that? Because it sounds odd to say that the ultimate conclusion of whether it's a functional equivalent of the border would be reviewed for clear error. To me, at least, it sounds odd. And I may have been inartful in phrasing that point. I think the ultimate conclusion is probably a mixed question of law and fact. The underlying facts, though, for instance, Your Honor, that Louisville was the last place that the package could have been searched before it left the United States, that, I believe, is a factual question, which necessarily leads to the conclusion that Louisville was the functional equivalent of the border. Okay. And which judge made the finding on that? I believe both judges, but there's no question that Judge Anderson, in his extensive findings, and I can cite the excerpt of record where he Page 100. And you're right. I realized afterwards I lost track of which judge was which, but page 100 does seem to include what you're talking about. Thank you, Your Honor. Pages 99 and 100, that's my understanding as well. Okay. Thank you. And I don't know if the panel has any other questions on any of the other issues. I'm happy to address them. I wonder if you could speak to the impact of the Cardona decision, which in the context of that case, decided that recognizing that it's difficult to separate functional equivalent and extended border search, decided in that case it should fall on the extended search side of the line so that reasonable suspicion was required. Yes, Your Honor. The government addresses the Cardona case on page 31 of its brief, and I think the key distinction in Cardona compared to here is that in Cardona, the package in question was going to, or the packages in question, were going to pass into numerous hands before they left the country, and therefore, there would be additional opportunities to search those packages. Whereas here, the entire operation of UPS and customs is set up in such a way that Louisville is the final place, and the record, again, which is, I believe, clear, establishes that there would have been no additional opportunity. And that type of factual distinction, I think, is a fairly bright line which separates the functional equivalent of the border doctrine from the extended border search doctrine. I don't know if the panel has any other questions. If not, I'll... Well, could you address the issue as to why a Social Security card without a photograph should be considered an identification card within the meaning of Section 1028? Yes, Your Honor. And I think the issue there, of course, is whether or not the district court erred in rejecting or denying, I should say, Defendant's Rule 29 motion. The government introduced the testimony of Social Security agent Paul Yokoyama, who testified that, in his experience, Social Security cards are identification documents. And therefore, the government believes it had an evidentiary basis to establish that element of Section 1028. With regard to the, more strictly speaking, legal issue, why are Social Security cards identification documents? I believe there are three reasons why that's the case. First, a reading of the statute would suggest that that is the right conclusion. I believe that Section 1028A7 establishes that Social Security numbers are means of identification. When that Social Security number is imprinted on an official government issued document, it converts the means of identification into an identification document. In addition, Your Honor, I think the only case on point, and granted it's a the only case on point, is clear that Social Security cards are identification documents under the meaning of 1028A2. And then, lastly, Your Honor, I think it simply comports with common sense that Social Security documents, Social Security cards, are treated as means of identification and identification documents in our society in any number of different ways. And I think those are spelled out in the government's brief. So I think there is very solid foundation for the conclusion here that Social Security cards are identification documents within the meaning of 1028A2. But they're used in the military. Yes, Your Honor. Exclusively. I think a number of contexts they're relied on, either exclusively or in part, as identification documents. Even as the card, I think, says, not for identification, and yet it used to be in Hawaii, you couldn't get a driver's license without having this card which said not for identification. And I think in the record, the AUSA who argued the motion to dismiss, the Rule 29 motion, indicated that perhaps historically Social Security cards were not going to be used as means of identification, but that's simply not how things have developed over time. When the cards first came out, we weren't even putting pictures on driver's license. Well, I don't believe that the fact that it doesn't have a photograph of the individual is in any way dispositive. There's certainly no requirement in 1028 that identification documents come with photographs of the individual in question. I still have my Social Security card. I got that in 1938 when I was working at the Los Angeles Coliseum. Contrary to legend, the number is not one, right? No, it's three. Anyway. Without any additional questions, I think I'll sit down. I thank you for your time. How about this argument about the reporting condition and the parolee required to answer all questions truthfully? Well, I think I... When that's a Fifth Amendment violation. I believe that I agree with counsel for Defendant Dabuchi that the Rodriguez case is dispositive on that point. And... Did Rodriguez take up the issue of a condition of parole or probation that I'm sorry, did it do that? Did it have that in there? I'm not sure, Your Honor. I think the reporting requirement was squarely at issue, which is what is being contested here. And in Rodriguez, of course, this Court has found that that is not a violation, and I don't think there's any reason, any way to reasonably distinguish that case from this one. With regard to the other condition, the other sentencing condition that's at issue here, the domestic violence condition, I will confess that of the arguments today, that is the one where I think defense, the defendant can get some traction. I think the other arguments here today are quite clear that they were decided properly at the district court. However, I do believe, based on the fact that Judge Anderson made clear to the parties at the beginning of the sentencing hearing that it was his intention to impose a domestic violence condition, and the fact that defendants, after conferring with counsel, chose not to object, that that puts us in a place where the standard is clear error, and Judge Anderson, in the record, established that defendant and his wife were still married at the time, that their relationship had been strained, and that there is a condition, excuse me, there is a sentence in the pre-sentence or paragraph in the pre-sentence report. If I could just have a moment. Well, there's a lot of information on the pre-sentence report about, you know, wife beating and harassment. Thank you. You know, and all that. So I don't have any trouble with that condition. Are you suggesting the standard is clear error rather than plain error? I'm sorry. I probably misspoke. Plain error, Your Honor. And the paragraph in question I was referring to was paragraph 56, which, again, buttresses what Judge Anderson found in actually asking a question of the defendant at the sentencing hearing concerning the nature of his relationship with his wife. Okay. Thank you. Thank you. Thank you. Thank you. Very briefly, at the time that Judge Anderson advised counsel at the outset of the sentencing hearing about his intention to impose the domestic violence treatment condition, the question was not whether he was going to object or not, but whether he wanted more time, which is normally the appropriate procedure if you're going to impose a nonstandard condition of supervised release. So even though I agree it's under a plain error standard, it's not something worse in terms of waiver or forfeiture, because the question was, did you want more time, not whether you were going to object. And I would just ask the Court to look very carefully at Agent Crase's testimony and what he actually was able to testify to from his own personal knowledge rather than his speculation. He often couched his answers in, that's my understanding. And I think that if this Court's going to rely on what he said, it should be based on things that were his personal knowledge or that he testified to with knowledge based on business records or some type of reliable information. And this is just what he had heard and what he understood. We really don't know from this record much at all about what happens with UPS. To that issue, my impression, I will go back and look at it myself, my impression is that he was limited with regard to his ability to talk about the express company. This one is UPS, right? Yes. Okay. What UPS did. But he was more knowledgeable with regard to the customs, the government's practice. And it seems to me that's the part that matters. If customs has decided to set up shop and say, this is where we're inspecting things for the border, then does the manipulation of the package afterwards by the freight company make very much difference? I guess it could, Your Honor. One of the things they tried to develop at the hearing was this question of, okay, so it leaves Louisville, and it goes somewhere or not, and it sits for how long, and do the packages come off the plane in Anchorage or Miami or Philadelphia? Because in the FedEx case, in Selgin, they didn't. I mean, Judge Stotling made very specific findings that the plane sort of sits there, the packages sit there, it's in, you know, takeoff position. I mean, in this case, we don't know, and there was certainly, Agent Crace allowed us how he doesn't know what happens. Do the cans get all redistributed? They're sealed. Maybe they're sealed. He'd never seen a lock. He thinks he's seen a seal. So we really, we just don't have as much information as we think we do. So what? So what? Well, I think that that, under Almeida-Sanchez and under Cardona, has a constitutional significance. The amount of time that might pass between the takeoff at Louisville, Kentucky, and crossing the international border, or at least leaving the point of entry. What do you think could happen? Someone else could get hold of that container and put contraband and package going to Lebanon? We don't even know what UPS's, you know, protocol is in terms of what they do to repackage or not repackage. We just have speculation on that point. And I will complete with that. Thank you very much. Thank you. It's always a pleasure to have you here. We'll take our recess and we'll be back.
judges: Pregerson, Gould, Clifton